IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION


CHRIS MCKINNEY,

        Plaintiff,

   vs.

BENTON COUNTY, et al.,

        Defendants.

Case No. 6:19-cv-01444-AA
**OPINION AND ORDER**

AIKEN, District Judge:

In connection to his employment at the Benton County Health Department ("BCHD"), plaintiff Chris McKinney filed this action against defendants Benton County, BCHD, and five County employees: Sheriff Scott Jackson ("Jackson"), Undersheriff Greg Ridler ("Ridler"), Mitch Anderson ("Anderson"), Dannielle Brown ("Brown"), and Dawn Emerick ("Emerick"). Plaintiff's First Amended Complaint ("FAC") (doc. 16)[1] asserts four claims: a claim under 42 U.S.C. § 1983 for violation of his Fourth and Fourteenth Amendment rights; and three claims under the Oregon

---

[1] The operative complaint (doc. 16) is docketed as the "Corrected Amended Complaint." But, for purposes of this Opinion, the Court will refer to the it as the First Amended Complaint or FAC.

Tort Claims Act ("OTCA") for intentional infliction of emotional distress ("IIED"); intentional interference with prospective economic relations ("IIER"); and wrongful termination based on retaliation. Defendants filed a Motion to Dismiss (doc. 19), seeking dismissal of plaintiff's § 1983, IIED, and IIER claims for failure to state a claim and plaintiff's state law claims for failure comply with notice requirements of the Oregon Tort Claims Act ("OTCA"). For the following reasons, defendants' Motion to Dismiss (doc. 19) is GRANTED in part and DENIED in part.

## BACKGROUND

Plaintiff started working at BCHD as a Forensic Peer Support Specialist in July 2016. In this position, he met with arrestees of the Benton County Sheriff's Office. Plaintiff alleges that defendants engaged in a "systematic campaign to create a case for terminating plaintiff based on a series of unfounded disciplinary actions, arising out of false allegations against plaintiff. First Amend. Compl. ¶¶ 31, 33.

In June 2017, plaintiff was videotaped handling a client's purse in the county jail. After viewing the tape and reading statements by Sheriff's Office employees, Jackson, the Sheriff of Benton County, concluded that plaintiff had stolen items from the purse. As a result, Jackson decided to bar plaintiff from the jail. Jackson sent an email communicating this decision to three BCHD Human Resources employees.

In November 2017, plaintiff was informed of the allegations of theft against him, and shortly thereafter attended an investigatory meeting. In response to the incident, Ridler, the Undersheriff of Benton County, produced a report stating plaintiff was "observed" in the video recording and by Benton County deputies acting

in an unusual manner.  Plaintiff alleges that, during the meeting, he; Brown, the Deputy Director of BCHD; his immediate supervisor; his union representative; and a human resources analyst reviewed the video recording, which confirmed plaintiff had not stolen from his client's purse.  Neither Ridler nor Jackson attended the meeting.

After the meeting, plaintiff met with Brown, who informed plaintiff that he had no culpability regarding the purse incident and no legal or disciplinary action was warranted.  Plaintiff then received a letter of expectations detailing the Department's handling of client property, and allegedly stating that plaintiff's explanation regarding the incident was "credible."  Despite this finding, Jackson and Ridler did not retract their allegations against plaintiff and continued to ban plaintiff from the jail and the immediate vicinity.

In April 2018, plaintiff emailed Jackson to ask if plaintiff could rent a room to a convicted sex offender, who was a Benton County client.  Jackson denied the request in an email to plaintiff, and implied that plaintiff was using poor judgement.  Following this correspondence, Jackson sent an embarrassing email detailing plaintiff's inquiry to County employees, including to Ridler, Brown, and Anderson, the Director of BCHD.

A few months later, plaintiff attended another fact-finding meeting with Brown as a result of complaints from County clients about plaintiff's inappropriate interactions with them nearly a year earlier.  Based on this investigation, Brown required plaintiff to complete boundary training before he could have further contact

with clients.  Even after plaintiff completed the training, Jackson and Ridler refused to allow plaintiff back into the jail.

In January 2019, a client entered the BCHD building and threatened those inside.  Plaintiff defused the situation by directing the person into a side room away from the other clients and employees.  Brown issued plaintiff a written reprimand for this incident and cited him for violating the "no client contact" directive.

In February 2019, plaintiff began renting a room in his home to a Lincoln County Mental Health client.  While the client was living at his home, he took her to counseling at the Lincoln County Mental Health facility.  Following this visit, Brown falsely accused plaintiff of identifying himself as a Lincoln County Mental Health crisis worker and soliciting other potential renters at the mental health facility.

On April 15, 2019, Emerick, the Health Department Director of BCHD, fired plaintiff from BCHD.  Prior to his termination, plaintiff told his co-workers that he intended to sue Brown and Jackson for falsely accusing him of theft and for humiliating and damaging his reputation and integrity.  Plaintiff's termination letter, which contained Jackson and Ridler's accusations, was placed in his personnel file.

On August 2, 2019, plaintiff filed an action in Benton County Circuit Court. Defendants then removed the action to this Court on September 9, 2019.

## STANDARD

When considering a motion to dismiss, a court construes a complaint in favor of the plaintiff and takes all factual allegations as true. *Odom v. Microsoft Corp.*, 486

F.3d 541, 545 (9th Cir. 2007). "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content', and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A "formulaic recitation of the elements of a cause of action" or "naked assertions devoid of further factual enhancement" and not sufficient to state a plausible claim. *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Dismissal under Rule 12(b)(6) is proper only when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013).

## DISCUSSION

Defendants move to dismiss plaintiff's complaint under three theories. Defendants contend that plaintiff fails to state a claim upon which relief can be granted as to his § 1983, IIED, and IIER claims. Further, defendants assert that they are protected from plaintiff's § 1983 claims due to qualified immunity. Finally, defendant argues that plaintiff's IIED, IIER, and wrongful termination claims are barred by his failure to provide proper notice pursuant to the OTCA.

Plaintiff contests that his complaint alleged facts that (1) are sufficient to withstand a motion to dismiss for failure to state a claim (2) show that he provided proper notice of his OTCA claims, and (3) show waiver of immunity.

## I.    *Federal Claims Under § 1983*

Plaintiff brings claims under 42 U.S.C. § 1983, asserting defendants violated rights protected by the Fourth and Fourteenth Amendments to the U.S. Constitution. The FAC asserts that defendants interfered with plaintiff's constitutional rights and privileges "including but not limited to his right to life, liberty, property, equal protection, and substantive due process under the Fourteenth Amendment." First Amend. Compl. ¶ 49.

Defendants contend that the facts pleaded in the FAC are not sufficient to allege that plaintiff's rights were violated. Defendants also argue that the individual defendants are shielded from liability for claims against them in their individual capacity by qualified immunity and that plaintiff failed to plead sufficient facts to establish the County's liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691–694 (1978).

### A.    *Due Process*

The FAC alleges that Jackson and Ridler "denied Plaintiff due process," in several ways, and that, by "[p]lacing . . . stigmatizing information in Plaintiff's personnel file and publishing it through email" defendants "interfered with Plaintiff's" right to "substantive due process under the Fourteenth Amendment." First Amend. Compl. ¶¶ 44, 49. Defendants argue that the FAC fails to identify any property interest protected by the Due Process Clause of the Fourteenth Amendment. Mot. to Dismiss (doc. 19) at 8. Plaintiff's response clarified that the FAC alleged an interference with the liberty interest that "[g]overnment employees have . . . in

continuing work in their chosen profession." Resp. (doc. 25) at 8. Plaintiff contends that the FAC alleges that defendants interfered with that liberty interest by making stigmatizing statements about him in the course of his termination and, thus, alleges a substantive due process claim. *Id.*

The Fourteenth Amendment's guarantee of due process applies when a constitutionally protected liberty of property interest is at stake. *Bd. of Regents of State Colls v. Roth*, 408 U.S. 564, 569 (1972). Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (internal quotation marks omitted). By contrast, procedural due process protects persons "not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259 (1978). Nevertheless, both substantive and procedural due process claims require a threshold "showing of a liberty or property interest protected by the Constitution." *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994).

Defendants argue, as an initial matter, that "[a]t a minimum, the substantive due process claim should be dismissed as to the non-employer defendants" Jackson and Ridler. Reply Br. (doc. 28) at 4. Defendants rely on *LaCrosse v. Clarkson*, but the relevant ruling in that case applies to property interests, not liberty interests. *Id.* (citing 2019 WL 2571274, at *6 (D. Or. Mar. 22, 2019), *report and recommendation adopted*, 2019 WL 2569550 (D. Or. June 20, 2019)).

In *LaCrosse*, the plaintiff, a Marion County Sheriff's Office employee, sued the Marion County District Attorney in her official capacity and the Marion County District Attorney's Office for improperly initiating an investigation under *Brady v. Maryland* that resulted in the defendants' decision not to call the plaintiff as a trial witness in future cases, and ultimately led to changes in his job duties.[2]  The plaintiff asserted Fourteenth Amendment substantive and procedural due process claims against defendants, alleging that their decision and the subsequent changes to his duties deprived him of constitutionally protected property and liberty interests.

As the court in *LaCrosse* explained, public employees have a "property interest" in the terms and conditions of their employment if that interest is established "by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *LaCrosse*, 2019 WL 2571274, at *4 (quoting *Roth*, 408 U.S. at 577).  *LaCrosse* held that none of the contract-like agreements with which the plaintiff attempted to establish a property right in his employment were enforceable against the non-employer, Marion County DA defendants, who were not subject to the terms or policies of those agreements.  *Id.* at *5–6.

In this case, however, plaintiff's due process claim alleges deprivation of a *liberty* interest in his chosen profession—not a property right.  An occupational liberty interest is derived from the fundamental understanding that an individual

---

[2] *Brady* material is exculpatory or impeaching evidence, which prosecutors are required to disclose to defense counsel under *Brady v. Maryland,* 373 U.S. 83 (1963).

has the freedom to "engage in any of the common occupations of life." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). Establishing an infringement of an occupational liberty interest, therefore does not require there be an employment relationship between plaintiff and defendant, but instead that a government actor deprive an individual of all possible employment opportunities in that person's chosen profession. Therefore, Jackson and Ridler are not entitled to dismissal of the substantive due process claims against simply because they were not plaintiff's employers.

The right to pursue a chosen profession is a liberty interest protected by due process. *Id.* ("Without doubt, [due process of the Fourteenth Amendment] denotes not merely freedom from bodily restraint but also the right of the individual to … engage in any of the common occupations of life."); *see also Bollow v. Fed. Reserve Bank of San Francisco,* 650 F.2d 1093, 110 (9th Cir.1981) ("The liberty protected by the due process clause of the fifth and fourteenth amendments encompasses an individual's freedom to work and earn a living."). In the public employment context, the Government is freer in its dealings with citizen employees than when it "brings its sovereign power to bear on citizens at large." *Engquist v. Oregon Dep't of Agric.,* 553 U.S. 591, 598 (2008)). "This distinction is grounded on the 'common-sense realization' that if every 'employment decision became a constitutional matter,' the Government could not function." *LaCrosse*, 2019 WL 2571274, at *3 (quoting *NASA v. Nelson*, 562 U.S. 134, 148 (2011)).

To allege a deprivation of occupational liberty in the employment termination context, a public employee must show (1) the employer made a charge that impaired the employee's reputation for honesty or morality; (2) the accuracy of the charge is contested; (3) there was some public disclosure of the charge; and (4) the charge was made in connection with termination of employment. *See Matthews v. Harney Cnty., Or. Sch. Dist. No. 4*, 819 F.2d 889, 891–92 (9th Cir. 1987).

Here, the FAC alleges facts showing that defendants made stigmatizing charges against plaintiff, that plaintiff contests the accuracy of those charges, and that some of the charges were made in connection with his termination. It fails, however, to sufficiently plead the requirement that defendants publicly disclose the charges.

### 1.    *Stigmatizing Charge*

To implicate constitutional liberty interests, the reasons for dismissal must be sufficiently serious to "stigmatize" or otherwise burden the individual so that he is not able to take advantage of other employment opportunities. *Bollow,* 650 F.2d at 1101. In other words, the stigma must "seriously damage[ ] a person's reputation or significantly foreclose[ ] his freedom to take advantage of other employment opportunities." *Id.* (internal quotation marks omitted). Additionally, the charges must amount to accusations of moral turpitude, such as immorality or dishonesty, to invoke constitutional protection. *Hyland v. Wonder*, 972 F.2d 1129, 1142 (9th Cir. 1992). Accusations that an employee is incompetent, unable to get along with others,

lacks judgment, or is generally untrustworthy fail to rise to a level that implicates a liberty interest. *Harrington v. City of Portland*, 677 F. Supp. 1491, 1501 (D. Or. 1987).

The FAC alleges that Jackson and Ridler accused plaintiff of stealing from a BCHD client's purse and acting inappropriately around jail staff. Those accusations were in the email banning plaintiff from the jail and in the reports that Ridler prepared and shared with BCHD management. First Amend. Compl. ¶¶ 15, 17. Brown then incorporated these allegations in plaintiff's termination letter and used them to form the basis of plaintiff's termination. *Id*. at ¶ 44. The FAC alleges that, together, the email, reports, and termination letter accused plaintiff of "insubordination, willfully giving false information and improper conduct by a County employee, and misconduct in the performance of employment duties or failure to perform duties or legal requirements." *Id*. at ¶ 33. Defendants' statements that plaintiff stole from a client amounts to an accusation of immorality and dishonesty and is, thus, sufficiently serious to stigmatize plaintiff.

### 2.    *Contesting Accuracy*

The FAC alleges that the charges of misconduct are inaccurate. First Amend. Compl. ¶¶ 17, 28. It also alleges that an BCHD investigation into the theft accusation determined that it was unfounded. *Id*. at ¶ 18. Plaintiff, therefore, adequately alleges that the charges' accuracy is contested.

### 3.    *In Connection with Termination*

A stigmatizing charge is connected to termination "when defamatory statements are so closely related to discharge from employment that the discharge

itself may become stigmatizing in the public eye." *Campanelli v. Bockrath,* 100 F.3d 1476, 1482 (9th Cir. 1996).  This standard requires that there be "some temporal nexus between the employer's statements and the termination."  *Id.* at 1483.  The Ninth Circuit has refused to adopt bright-line rules in determining whether this temporal nexus has been satisfied.  *Perez v. City of Roseville*, 926 F.3d 511, 524 (9th Cir. 2019).  Instead, "the allegedly stigmatizing statements and the termination need not be simultaneous, but the statements must be 'so closely related to discharge from employment' that they are 'in the course of the [plaintiff's] termination.'"  *Id.* (quoting *Campanelli*, 100 F.3d at 1482).

The FAC alleges that the charges are cited in his termination letter and serve as the basis for his dismissal.  First Amend. Compl. ¶¶ 32, 33.  Unlike cases in which the charges at issue are defamatory statements or documents publicly released at some other time than plaintiff's termination, in cases where the charges are contained in a plaintiff's termination letter, it is clear that the charges are made in connection with termination of employment.  *See Cox v. Roskelley*, 359 F.3d 1105, 1113 (9th Cir. 2004).  Therefore, this stigmatizing charge was made in connection with his termination.

By contrast, the FAC does not allege facts showing that the theft accusations in Jackson's email to jail personnel and BCHD management and Ridler's letter to BCHD were made in connection with his termination.  Although the exact timing of these allegations is unclear from the facts pled, the FAC alleges that defendants investigated and disciplined him for the theft allegation in December 2017.  First

Amend. Compl. at ¶ 16-20.  Plaintiff was terminated April 15, 2019—approximately 16 months after Jackson's email and Rider's letter.  *Id.* at ¶ 30.

This length of time is too remote to establish a temporal nexus to termination. Instead, defamation "must occur at or near the time of termination."  The Ninth Circuit has held that a period of 16 months is "far too remote from the termination to meet *Campanelli's* 'temporal nexus' test." *Tibbetts v. Kulongoski*, 567 F.3d 529, 538 (9th Cir. 2009).  As such, plaintiff fails to allege facts sufficient to establish the "in connection with termination" element for his theory of deprivation of occupational liberty premised on Jackson's email and Rider's letter.

### 4.    *Publication*

Finally, a stigmatizing charge made in connection with a plaintiff's termination only implicates a constitutional right if there is "some public disclosure" of it.  *Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 777–78 (9th Cir. 1982). Publication occurs when defendants disseminate stigmatizing comments in a way that would reach potential future employers or the "community at large." *Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1274 (D. Or. 2014) (quoting *Palka v. Shelton*, 623 F.3d 447, 454 (7th Cir. 2010)); *Learned v. City of Bellevue*, 860 F.2d 928, 933 (9th Cir. 1988) (defamatory remarks that did not reach beyond the Department "would not interfere with [plaintiff]'s liberty to pursue the career of his choice" and therefore did not satisfy the publication element).[3]

---

[3] Plaintiff also alleges publication occurred when Jackson and Ridler disseminated stigmatizing information about plaintiff among BCHD and Benton County Sheriff's Office and to

Plaintiff appears to allege publication based on defendants' placement of stigmatizing information in plaintiff's personnel file, which he alleges "will likely keep [p]laintiff from ever obtaining employment in his chosen career." First Amend. Compl. ¶ 32. This theory does not satisfy the publication requirement.

Plaintiff fails to allege how future employers would be able to review the records in his personnel file detailing plaintiff's alleged theft, disciplinary actions, and termination. A government employer's placement of stigmatizing information in a plaintiff's personnel file constitutes publication if governing state law mandates disclosure of the information upon request. For example, in *Cox*, plaintiff brought a due process suit against his employer, Spokane County, for violation of his occupational liberty rights after the county released his termination letter to a local newspaper pursuant to a public records request. *Cox*, 359 F.3d at 1110. The letter stated that the plaintiff had been fired from his position as Risk Manager for failing to meet his responsibilities and exhibiting poor managerial judgment in overseeing vehicle damage liability claims related to a botched road project. *Id.* at 1107. The Ninth Circuit held that placement of stigmatizing information in the plaintiff's personnel file by his county employer "constituted publication sufficient to trigger [plaintiff's] liberty interest under the Fourteenth Amendment" because government employee personnel files are public records under Washington state law. *Id.* at 1112.

---

plaintiff's clients. Even assuming those communications are publication of stigmatizing information, they were too remote to be "in connection with termination," as discussed above.

In Oregon, the public "has a right to inspect any public record" that is not expressly exempt under ORS 192.338, 192.345, and 192.355. ORS 192.314. Under Oregon law, a "public record" is "any writing that contains information relating to the conduct of the public's business" that is "prepared, owned, used, or retained by a public body." ORS 192.311. While personnel files of public employees fall under Oregon's "public record" definition, disciplinary actions contained in personnel files of public employees are conditionally exempt from disclosure. ORS 192.345(12) (providing that a "personnel discipline action, or materials" supporting that action are exempt from disclosure "unless the public interest requires disclosure in the particular instance"). Here, while plaintiff claims his personnel file is "public," he fails to address how potential employers or the public would gain access to the stigmatizing charges in the conditionally exempt disciplinary actions in that file. *See Boggs v. Hoover*, 2009 WL 2447553, at *8 (D. Or. Aug. 6, 2009) ("[T]he mere placement of stigmatizing information in an employee's personnel file does not constitute publication under Oregon law.").

Because plaintiff fails to adequately allege the publication requirement to establish deprivation of an occupational liberty interest, the Court concludes that plaintiff has not sufficiently alleged a claim under § 1983 for violation of Fourteenth Amendment due process. However, plaintiff shall have leave to amend this claim.

### 5.    *Motion to Make More Definite and Certain*

Defendants sought, in the alternative, an order to make plaintiff's due process claim more definite and certain. They argue plaintiff's pleadings are ambiguous as

to whether he alleges a substantive or procedural due process violation, or both. Because the FAC fails to allege facts showing a deprivation of a constitutionally protected interest and, therefore, fails to state a § 1983 claim for violation of plaintiff's due process rights, whether substantive or procedural, the Court need not rule on this motion, but the Court does agree with defendants that the FAC is ambiguous in this regard.

The FAC and the response brief both state plaintiff seeks relief under the theory of substantive due process, yet some of the allegations appear to implicate procedural due process.   For instance, the FAC references several "procedural deficiencies," such as Jackson and Ridler's failure to attend the BCHD investigatory meeting, First Amend. Compl. ¶ 44, the insufficiency of the fact-finding hearings, *id.* at ¶ 22, and plaintiff's claim that he was entitled to a name-clearing hearing, *id.* at ¶ 15.   Upon refiling, plaintiff should clarify which type of due process claim—substantive or procedural—he asserts.

### B.    *Equal Protection*

Plaintiff also contends that defendants' actions denied him equal protection of the law.   First Amend. Compl. ¶ 49.   However, the FAC does not allege facts that suggest that plaintiff was treated differently than others similarly situated or that such different treatment was based on his membership in any particular class.   *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001).   To the extent plaintiff alleges that he was singled out for mistreatment, a "class-of-one" claim of equal protection is not

actionable in the public employment context. *Engquist,* 553 U.S. at 609 ("Public employees typically have a variety of protections from just the sort of personnel actions about which Engquist complains, but the Equal Protection Clause is not one of them."). Accordingly, the Court concludes that plaintiff has not sufficiently alleged a claim under § 1983 for violation of Fourteenth Amendment equal protection.

### C.    *Fourth Amendment*

Plaintiff alleges defendants violated his Fourth Amendment rights. First Amend. Compl. ¶ 42. The Fourth Amendment protects individuals from unreasonable searches and seizures without probable cause. U.S. Const. amend. IV, § 1. The FAC, however, is completely devoid of any facts that could give rise to a Fourth Amendment claim. Accordingly, the Court concludes that plaintiff has not alleged a claim under § 1983 for violation of his Fourth Amendment rights.

### D. Monell *Liability and Qualified Immunity*

As explained above, the FAC fails to allege facts sufficient to show violations of plaintiff's due process, equal protection, and Fourth Amendment rights. Because plaintiff has not pleaded a violation of his constitutionally protect rights, he cannot establish *Monell* liability for the County and County employee defendants are shielded from suit by qualified immunity and the claims asserted against them are dismissed for these additional reasons.

In a civil rights action under § 1983, a municipality cannot be held liable on a simple theory of respondeat superior. *Monell*, 436 U.S. at 692. Instead, the "municipality can be found liable under § 1983 only where the municipality *itself*

causes the constitutional violation at issue." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original). A governmental entity may be liable under § 1983 only if the plaintiff shows: (1) he was deprived of a constitutional right; (2) the municipality has a policy; (3) the policy amounts to a deliberate indifference to his constitutional rights; and (4) the policy is the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty. Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1111–12 (9th Cir. 2001).

Defendants argue that plaintiff failed to state a claim for which relief can be granted because he had not alleged that the County has a policy or custom of violating constitutional rights. Mot. to Dismiss at 7. However, this Court need not consider whether the County has a policy or custom violating constitutional rights because the first element required to establish *Monell* liability is a "depriv[ation] of a constitutional right." *Mabe*, 237 F.3d at 1111. As discussed above, plaintiff fails to allege a deprivation of a protected constitutional right. Therefore, the County is not subject to *Monell* liability.

Similarly, plaintiff fails to plead facts required to overcome County employee defendants' qualified immunity. Qualified immunity protects defendants "from suit" and is not "a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 237 (2009) (citation and quotation marks omitted). Qualified immunity protects state actors from liability for violating rights that are not clearly established. *Id*. at 232. In the two-pronged inquiry, courts must consider whether the facts alleged make out a

violation of a constitutional right and whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. *Id*. at 231.

Defendants argue that they are entitled to qualified immunity because plaintiff failed to plead a constitutionally protected interest that was violated. Mot. to Dismiss at 5. The Court agrees that the FAC fails to allege a violation of a constitutional right. Therefore, the County employee defendants are entitled to qualified immunity.

## II.    *State Law Claims*

Plaintiff also brings claims under the OTCA for intentional infliction of emotional distress, intentional interference with prospective economic relations, and wrongful termination. Defendants argue that Plaintiff's intentional infliction of emotional distress and intentional interference with prospective economic relations should be dismissed for failure to state a claim. They also move to dismiss all three tort claims based on plaintiff's failure to allege compliance with the notice requirement of the Oregon Tort Claims Act.

### A.    *Intentional Infliction of Emotional Distress*

The FAC asserts a claim for intentional infliction of emotional distress ("IIED") against all defendants (claim 2). To state a claim for IIED, a plaintiff must allege facts showing: "(1) that defendants intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress; (2) that defendants engaged in outrageous conduct, *i.e.*, conduct extraordinarily beyond the bounds of socially tolerable behavior; and (3) that

defendants' conduct in fact caused plaintiff severe emotional distress." *House v. Hicks*, 218 Or. App. 348, 357–58 (2008) (citing *McGanty v. Staudenraus*, 321 Or. 532, 543 (1995)).

Defendants argue that plaintiff fails to allege the level of outrageous conduct required to establish an IIED claim. The extraordinary conduct element of an IIED claim requires conduct that is "outrageous in the extreme." *Watte v. Edgar Maeyens, Jr., M.D., P.C.,* 112 Or. App. 234, 239 (1992). Conduct that is merely "rude, boorish, tyrannical, churlish and mean" does not satisfy that standard, nor do "insults, harsh or intimidating words, or rude behavior ordinarily result in liability even when intended to cause distress." *Id.* (internal citations omitted). Oregon cases recognizing IIED claims typically involve acts of psychological and physical intimidation, racism, or sexual harassment. *Volm v. Legacy Health Sys., Inc.*, 237 F. Supp. 2d 1166, 1180 (D. Or. 2002)

Plaintiff fails to allege facts showing that defendants' conduct rises to the level of "outrageous in the extreme." Plaintiff contends that a jury could infer from the facts alleged in the FAC that defendants set out to destroy his career and impugn his character, leveled allegations of wrongdoing against plaintiff without providing him the opportunity to clear his name, and disseminated humiliating information about him to his coworkers and clients.

Even assuming those inferences can be made, this conduct is insufficient to constitute an extraordinary transgression of the bounds of socially tolerable conduct. Oregon courts, and courts from this District applying Oregon law, have

refused to find actionable claims for IIED where plaintiff's argument is based on an employer's intentional sabotage of plaintiff's career, where employers wrongfully accuse plaintiff without providing an opportunity to clear the plaintiff's name, or where the employer intentionally encouraged a hostile atmosphere towards plaintiff in the workplace. *See, e.g., Petty v. Rogue Fed. Credit Union,* 106 Or. App. 538, 543 (1991) (holding that employer's conduct of intentionally assigning plaintiff to a position in which she would almost certainly fail because of her heavy accent, supervising her excessively, and zealously documenting complaints against her was not intentional infliction of emotional distress); *Volm,* 237 F. Supp. 2d at 1180 (holding that repeated meetings in which defendants blamed plaintiff for all problems existing at their place of work, accusing plaintiff of wrongdoing without providing her the information necessary to address them, and generally creating a hostile work environment could not support a finding of intentional infliction of emotional distress).

Because plaintiff has not established that defendants' actions constituted an extraordinary transgression of the bounds of socially tolerable conduct, plaintiff's IIED claim is dismissed.

**B.** ***Intentional Interference with Prospective Economic Relations***

The FAC asserts a claim for intentional interference with prospective economic relations ("IIER") against Brown and Anderson (claim 3).

Under Oregon law, to state a claim for IIER, a plaintiff must allege: (1) the existence of a professional or business relationship, (2) intentional interference with

that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages. *McGanty*, 321 Or. at 535. Defendants argue that plaintiff fails to allege the third-party element of IIER. They assert that, because they are Benton County employees, the third-party element also requires allegations demonstrating that defendants' alleged interference was caused by conduct outside the scope of their employment.

The third-party element of IIER stems from the general principle that a party to a contract cannot be liable for interference with that contract. *Id.* at 537. Because of this, IIER claims only serve as "a means of protecting contracting parties against interference in their contracts from *outside* parties." *Id.* (emphasis in original). The tort of IIER "allows a party to a contract, when that contract is breached by the other contracting (second) party, to seek damages from a third party that induced the second party to breach the contract." *Id.* at 536. Therefore, the typical IIER claim involves three parties: (1) the plaintiff, (2) the person or entity with whom the plaintiff has an economic relationship or prospective economic relationship, and (3) the third-party interferer-defendant.

The third-party element presents a hurdle for plaintiffs where the plaintiff alleges an IIER claim against an employee of the second party, *i.e.* the entity with which plaintiff has an economic relationship or prospective economic relationship. The doctrine of respondeat superior dictates that "an employer is liable for an employee's torts when the employee acts within the scope of employment." *Id.* at 538

(quoting *Chesterman v. Barmon,* 305 Or. 439, 442 (1988)). Thus, when employees of the second party act within the scope of their employment, their actions are considered those of their employer and they are not "outside parties" to the contract for purposes of the third-party element of an IIER claim.

Plaintiff concedes that the FAC does not adequately allege interference in any prospective economic advantage stemming from his employment with Benton County. Resp. (doc. 25) at 11. The Court agrees that the FAC is deficient in this regard because its allegations do not satisfy the third-party element of IIER.

Anderson and Brown are employees of Benton County and are therefore not third parties for purposes of an IIER claim unless their tortious conduct was taken outside their scope of employment with Benton County. An employee acts within the scope of her employment if: (1) the employee's act occurred substantially within the time and space limits authorized by the employment; (2) the employee was motivated, at least partially, by a purpose to serve the employer; and (3) the employee's act was of a kind which the employee was hired to perform. *Chesterman v. Barmon*, 305 Or. 439, 442 (1988).

The FAC alleges that Brown engaged in a variety of conduct that could be the basis of plaintiff's IIER claim against her, including attending fact-finding meetings concerning misconduct allegations against plaintiff, Brown's written reprimands to plaintiff, and Brown's recommendation that plaintiff be terminated from employment at BCHD. First Amend. Compl. ¶¶ 19, 22, 25, 26, 28. Considering the first *Chesterman* requirement, the plaintiff fails to allege that Brown took any of these

actions while outside the time and space limits authorized by her employment. Instead, Brown's conduct appears to have occurred during and at work.  Turning to the second requirement, nothing in the FAC suggests that Brown's conduct was wholly motivated by a desire other than that of serving BCHD.  Similarly, regarding the third requirement, Brown's conduct was the kind which she was hired to perform. The personnel management and disciplinary actions plaintiff alleges Brown engaged in are those that would likely be expected from a Deputy Director.  Plaintiff, therefore, did not plead adequate facts to establish Brown was acting outside her scope of employment for the purpose of establishing the third-party element required for an IIER claim.

Plaintiff also fails to sufficiently allege Anderson was acting outside his scope of employment.  The FAC is devoid of any factual allegations regarding Anderson's conduct.  The only factual allegation involving Anderson simply states "defendant [Jackson] publicly and widely questioned [p]laintiff's reputation for integrity and professionalism by disseminating the email [regarding plaintiff's request to house a sex offender] to [d]efendants Ridler, Anderson, [and] Brown."  First Amend. Compl. ¶ 21.  Such passive receipt of an allegedly stigmatizing email cannot qualify as "intentional" interference with an employment relationship, which requires some desire to bring about the interference on the part of the defendant.  *McGanty*, 321 Or. at 550.  Further, applying the *Chesterman* test, nothing about this allegation suggests that Anderson received of Jackson's email outside the time and space limits authorized by the employment, that Anderson was not motivated by a purpose to

serve the employer, or the Anderson's conduct was of a kind which the employee was not hired to perform. *Chesterman,* 305 Or. at 442. To the contrary, receiving an email from another County employee about the conduct of an employee of the Department seems squarely within Anderson's scope of employment.

In sum, plaintiff fails to allege claim-specific facts,[4] or facts in the FAC as a whole, that suggest any of Anderson or Brown's conduct was outside the scope of their employment. Without allegations that Anderson and Brown acted outside the scope of employment at Benton County, the long-established doctrine of respondeat superior applies, and plaintiff cannot establish the third-party element of his IIER claim, at least to the extent that that claim is based on interference with his employment at Benton County.

However, plaintiff argues that the FAC states a claim for IIER based on interference with his relationship with parties other than Benton County. Resp. at 11. He contends that, even if Benton County cannot be a third party for purposes of the claim, "other prospective employers clearly are third parties" and defendants' "outrageous and stigmatizing actions" interfered with "any possibility for prospective employment in his chosen field[.]" *Id.* (underlining in original).[5]

---

[4] Indeed, although the claim header states that the claim is against Brown and Anderson, the claim-specific allegations under that header concern the conduct of Ridler and Jackson and do not mention Anderson or Brown at all. *Compare* First Amend. Compl. at 11 *with id.* at ¶¶ 57–61. The Court also notes that, although defendants' Motion to Dismiss assert that the FAC that "Brown is preventing [plaintiff] from sitting for the CADC candidate test or training him to qualify as a Qualified Mental Health Associate," Mot. to Dismiss (doc. 19) at 12, The FAC does not include any allegation to that effect. Those allegations were in the original Complaint but they appear to have been dropped in amendment. Comp. ¶ 66-67.

[5] Plaintiff's understanding of the "third party" element of IIER is not quite accurate. "Third party" refers to the status of the defendant, as a third party to the contract that the defendant has

Defendants respond that "inchoate relationships [plaintiff] may have in the future with other employers" cannot serve as the basis for an IIER claim because IIER requires "the existence of a prospective economic advantage." Reply at 7.

To establish the existence of a prospective economic advantage, plaintiff must present evidence of the existence of a specific prospective business relationship with which defendant allegedly interfered. *Sharma v. Providence Health & Servs.-Oregon*, 289 Or. App. 644, 670, *rev. den.*, 363 Or. 283 (2018). This element requires a plaintiff identify the other party to the alleged prospective relationship with which the plaintiff alleges the defendant interfered. *Cron v. Zimmer*, 255 Or. App. 114, 127 (2013) (holding that to satisfy the existence of an economic relationship element, a plaintiff must establish a voluntary relationship with another party that would have very likely resulted in a pecuniary benefit for the plaintiff, had the defendant not interfered).

The FAC does not identify any specific prospective business relationship with which defendants allegedly interfered, other than his employment relationship with Benton County. Instead, plaintiff pleads generally that defendants' conduct "negatively impact[ed] his ability to obtain employment in his chosen career in the future." First Amend. Compl. ¶ 35. This is not the standard for an intentional interference with prospective business relations claim. IIER does not provide a cause

---

allegedly interfered with. *McGanty*, 321 Or. at 537. The issue, therefore, is not whether plaintiff had an agreement or relationship with a third party, but rather, whether Anderson or Brown were third parties to any business relationship that plaintiff had and whether they interfered with that relationship. As explained below, plaintiff's argument, even when liberally construed, fails because the FAC does not identify any relationship other than plaintiff's employment relationship with Benton County.

of action against anyone whom a plaintiff feels negatively affected that plaintiff's ability to procure some unidentified form of work in the future. Instead, the tort serves "as a means of protecting contracting parties against interference in their contracts from outside parties." *McGanty*, 321 Or. at 536. Therefore, plaintiff's IIER claim is dismissed.

### C.    *OTCA Notice*

Defendants bring a facial challenge to plaintiff's compliance with OTCA notice requirements, arguing that each of plaintiff's state tort claims must be dismissed because the FAC does not allege facts demonstrating that he complied with the timing or delivery requirements for notice under the OTCA. For the reasons set forth below, plaintiff failed to provide notice as required by the OTCA.

The OTCA "provides the exclusive remedy for pursuing a tort claim against a public body or claims against public employees acting within the course and scope of their employment." *Gonzales v. Deschutes County*, 2011 WL 4501053, at *3 (D. Or. Sept. 28, 2011). The OTCA requires that notice of a claim must be given to a public body "within 180 days after the alleged loss or injury." ORS 30.275(2)(b). A plaintiff may satisfy the notice requirement by providing "formal" or "actual" notice or by "[c]ommencement of an action on the claim" by or on behalf of the claimant within the 180-day notice period. ORS 30.275(3).

Under the OTCA, the plaintiff has the burden of proving that proper notice of claim was given. ORS 30.275(7). This means that facts demonstrating compliance with OTCA notice requirements must be alleged in the complaint. *Brown v. Portland*

*Sch. Dist. No. 1*, 291 Or. 77, 79 (1981) (noting that to withstand a motion to dismiss, allegations sufficient to establish proper notice must be plead in the complaint.)

The FAC alleges that plaintiff provided notice of his claims in three ways. First, it alleges that he hand delivered "Notice of Tort Claim" to Brown on or about January 16, 2018, at which point she informed plaintiff she would give a copy of the Notice to Anderson.  First. Amend. Comp. ¶ 37.  Second, it alleges that on or about June 25, 2018, plaintiff's attorney sent "formal Notice of Claim" via certified mail to the City/County Insurance Services ("CIS"), which CIS denied in a letter dated August 21, 2018.  *Id.* at ¶ 38.  Finally, it alleges that on October 2, 2019, plaintiff's counsel sent a tort claim notice to defendants' counsel advising of additional claims against the defendants.  *Id* at ¶ 40.

Plaintiff argues that these communications were "actual notice."  Resp. at 11–12.  Actual notice "is a communication that (1) allows the recipient to acquire actual knowledge of the time, place and circumstances that give rise to the specific claim or claims that the plaintiff ultimately asserts; and (2) would lead a reasonable person to conclude that the plaintiff has a general intent to assert a claim."  *Flug v. Univ. of Or.,* 335 Or. 540, 554 (2003); *see also* ORS § 30.275(6).  Actual notice must be provided to the public body at its principal administrative office, to any member of the governing body of the public body, to any attorney designated by the governing body as its general counsel, or to any person responsible for administering tort claims brought against the agency.  ORS 30.275(6).

Plaintiff's first theory of notice—the January 2018 notice that was hand delivered to Brown and that Brown promised to share with Anderson—does not satisfy this requirement. It was not sent to Benton County at its principal administrative office, and neither Brown nor Anderson are members of the governing body of Benton County, the County's general counsel, or agents of the County's insurance provider, nor are they responsible for investigating, negotiating, adjusting, or defending OTCA claims on behalf of the public body.[6]

Defendants also argue that plaintiff's June 2018 mailing to CIS and October 2019 communication to defense counsel were "not sufficiently provided pursuant to the OTCA." Mot. to Dismiss at 15. Defendants did not provide further explanation for their argument, and without more information both CIS and defense counsel appear to fall within the OTCA's definition of "person responsible for administering tort claims on behalf of a public body." ORS 30.275(6). The allegations that plaintiff sent notice to CIS and CIS responded by denying his claims support an inference that plaintiff sent notice to "as person who, acting within the scope of the person's responsibility, . . . as an employee or agent of an insurance carrier insuring the public body for risks." *Id*. And, by the time that plaintiff sent notice to defense counsel, counsel was performing litigation services for the Benton County that could be considered "investigation, negotiation, . . . or defense" of tort claims against Benton County.

---

[6] Plaintiff does not assert formal notice, but these communications would not constitute formal notice for the same reasons. *See* ORS 30.275(5) (formal notice must be given "to the public body at its principal administrative office, to any member of the governing body, or to an attorney designated by the governing body as its general counsel").

Defendants next argue that these notices were not timely.  As mentioned, the OTCA requires that notice be given to a public body "within 180 days after the alleged loss or injury[,]" whether that notice is formal, actual, or filing an action.  ORS 30.275(3).  The notice period begins when the cause of action accrues for purposes of the statute of limitations.  *Adams v. Oregon State Police,* 289 Or. 233, 238 (1980). Oregon applies the "discovery rule" to determine when a cause of action accrues, meaning the notice period begins to run "when the plaintiff knows, or in the exercise of reasonable care should have known, facts which would make a reasonable person aware of a substantial possibility that [a tort action] exists."  *Plumeau v. Sch. Dist. No. 40 Cty. of Yamhill*, 130 F.3d 432, 436 (9th Cir. 1997) (quoting *Gaston v. Parsons,* 318 Or. 247, 256 (1994)).

Defendants assert that the notice period began to run on November 21, 2017, when plaintiff was barred from jail.  Plaintiff does not appear to challenge that assertion with respect to his IIED and IIER claims.  The mailing to CIS and communication to defense counsel both occurred far outside the 180-day period, approximately seven and ten months after November 21, 2017.

Plaintiff does, however, challenge defendants' position on the accrual date of his wrongful termination claim.  According to plaintiff, the notice period for that claim began to run on April 15, 2019, when he learned of his termination.  Resp. at 12. Plaintiff is correct that, under Oregon law, common law wrongful termination claims accrue at "the end of the [plaintiff's] employment relationship," that is, the date that the plaintiff's termination became effective.  *Stupek v. Wyle Laboratories Corp.*, 327

Or. 433, 440 (1998).  The October 2, 2019, communication to defense counsel occurred 171 days after plaintiff's termination.  Thus, that communication was timely under the OTCA.

Finally, plaintiff argues the he satisfied the OTCA notice requirement by filing the Complaint and FAC in this action.  Resp. at 12.  However, those theories of notice were not alleged in the FAC.  Moreover, filing a complaint, and particularly an amended complaint, does not constitute notice under the OTCA.  Instead, a plaintiff can satisfy the notice requirement by "*[c]ommencement of an action on the claim*" within the 180-day time period.  ORS 30.275(3)(c) (emphasis added).  Even if filing a complaint could be considered OTCA notice, all complaints in this action were filed years after plaintiff's IIED and IIER claims accrued.

### D.    *Summary*

In sum, plaintiff's IIED and IIER claims are dismissed for failure to state a claim and failure to allege proper OTCA notice.  Because the FAC alleges proper notice of plaintiff's wrongful termination claim (the 2019 communication to defense counsel), defendant's motion to dismiss is denied with respect to that claim.  Plaintiff shall have leave to amend his IIED and IIER claims and to attempt to allege proper OTCA notice of those claims.  Pursuant to Benton County's request and ORS 30.265, Benton County will be substituted as the sole defendant for plaintiff's wrongful termination claim and any other OTCA claims alleged in the second amended

complaint.  ORS 30.265(3) (providing for mandatory substitution of the public body as the defendant upon motion).[7]

## CONCLUSION

For the reasons above, defendants' Motion to Dismiss (doc. 19) is GRANTED with respect to plaintiff's § 1983, IIED, and IIER claims and DENIED with respect to his wrongful termination claim.  Plaintiff shall have leave to file an amended complaint within 14 days of the date of this order.

IT IS SO ORDERED.

Dated this  25th  day of August 2020.


_____/s/Ann Aiken_____
Ann Aiken
United States District Judge

---

[7]  ORS 30.265(3) places several conditions on this mandatory substitution, all of which are satisfied here. And plaintiff concedes that substitution is appropriate.  Resp. at 12.